UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORDIA

CASE NO. _____

MIAMI HEAT LIMITED PARTNERSHIP,

    Plaintiff,

vs.

CLEAR CHANNEL BROADCASTING, INC.
d/b/a CLEAR CHANNEL RADIO,

    Defendant.
_____/

## COMPLAINT

Plaintiff, The Miami Heat Limited Partnership ("the Miami Heat" or "the Heat"), hereby sues Defendant, Clear Channel Broadcasting, Inc., d/b/a Clear Channel Radio ("Clear Channel"), and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff, the Miami Heat, is a Florida limited partnership with its principal place of business in Miami, Florida. The Miami Heat owns and operates a professional basketball team doing business in Miami, Florida.

2. Defendant, Clear Channel, is a Texas corporation with its principal place of business in San Antonio, Texas. Clear Channel is a national radio company that, *inter alia*, operates and broadcasts AM and FM radio stations in and throughout Miami, Florida.

3. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as the matter in controversy exceeds the value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

4. Venue in this district is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to this claim occurred in this district, and pursuant to the terms of the contract at issue.

## INTRODUCTION

5. In this action, the Miami Heat seeks relief from Clear Channel's breach of the parties' English Radio Broadcast Rights Agreement ("the Rights Agreement"). Pursuant to the Rights Agreement, the Heat was granted "Priority Broadcast Position." Specifically, the Rights Agreement provided that if another Florida professional or collegiate sports team was granted a Rights Agreement of greater total value per year, the Heat would be entitled to an equivalent package. In addition, the Rights Agreement explicitly provided that if another team was granted more beneficial material individual terms, the Heat would immediately be entitled to the benefit of those terms.

6. Less than two years after Clear Channel entered into the Rights Agreement with the Heat, it entered into a new, and, by any standards, much more generous agreement with the NFL's Miami Dolphins. The Clear Channel/Dolphins agreement was of substantially greater total value, and granted the Dolphins a large number of material individual terms of greater value than those granted to the Heat. As shown below, for several months, Clear Channel attempted to avoid disclosing to the Heat the actual terms of the Dolphins agreement, repeatedly assuring the Heat that the Dolphins were not granted better terms than the Heat. When the Heat was finally granted access to the Dolphins' agreement, it became clear why Clear Channel had been reluctant to disclose it: the Dolphins' agreement and its individual material terms were substantially more valuable than the Heat's Rights Agreement or its individual material terms.

7. Faced with its deception, Clear Channel initially indicated to the Heat that it would attempt to cure its breach and provide the Heat with the lion's share of terms and value given to the Dolphins. When pressed to confirm in writing that it was willing to cure, Clear Channel retreated, saying that it would only be willing to cure its breach in exchange for an extension. When its attempt to leverage an extension was rebuffed, Clear Channel's signal went silent: On the last business day of the Rights Agreement cure period, Clear Channel informed the Heat that, in fact, it would do nothing to cure its breach. As shown below, Clear Channel's strategy was designed to delay this dispute until the eve of the 2010-2011 NBA Season, in order to gain leverage on the Heat. For the reasons set forth in detail below, the Heat seeks redress for the damages flowing from Clear Channel's breach of contract and breach of its implied covenant of good faith and fair dealing.

## FACTS

8. On July 1, 2008, the Miami Heat and Clear Channel entered into the Rights Agreement. Pursuant to the Rights Agreement, Clear Channel agreed to broadcast all of the basketball games played by the Miami Heat, and related programming, on Clear Channel's WINZ during the three year period commencing with the 2008-2009 NBA basketball season, and continuing through the 2010-2011 NBA basketball season. The Rights Agreement provided the Miami Heat with an array of rights and protections. (A copy of the Rights Agreement is attached hereto as Exhibit "A.")

9. Pages 1 and 2 of the eighteen page Rights Agreement set forth some of the Miami Heat's most important rights and protections. Section 2.2 of the Rights Agreement provided that the station shall not preempt any Authorized Game or related broadcasts except for major news stories and other programming pursuant to FCC requirements. *See* Ex. A, §2.2.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower • 150 West Flagler Street • Miami, FL 33130

10. Section 2.4 of the Rights Agreement provided the Miami Heat with what was termed "Priority Broadcast Position," and contained what is commonly referred to as "most favored nation" language to benefit the Miami Heat. The rights and protections granted to the Miami Heat under section 2.4 are expansive. Section 2.4 begins as follows:

> Should the Station enter into an agreement to broadcast the games of another Florida professional or collegiate sports team where the agreement has a greater total value per year than the Contract with the Team, the Team shall receive an equivalent package, at no additional cost.

*Id.*, § 2.4.

11. The next sentence of Section 2.4 explicitly provides the Miami Heat with additional "most favored nation" rights. Not only was the Miami Heat guaranteed a total broadcast package equivalent or greater to any other Florida sports team, but the Miami Heat was guaranteed that if another Florida sports team is granted more beneficial material individual terms within a broadcast package, the Miami Heat would be entitled to the benefit of those material terms:

> *In addition*, if the agreement between the Station and another Florida professional or collegiate sports team contains material terms that are more beneficial to the other Florida professional or collegiate sports team than those under this Agreement, the Team is entitled to the benefit of any such material term.

*Id.* (Emphasis supplied)

12. The parties operated under the terms of the Rights Agreement during the 2008-2009 and 2009-2010 NBA seasons. On or about March 1, 2010, Clear Channel and the Miami Dolphins announced that they had reached a six-year agreement to broadcast Miami Dolphins games on WIOD and WBGG-FM. The announcement strongly suggested that Clear Channel had granted the Dolphins a package and material terms far in excess of what had been tendered to the Heat. On March 2, 2010, Michael McCullough of the Miami Heat reached out to Clear

Channel's Ken Charles, requesting a copy of the Clear Channel/Dolphins agreement in order to determine whether the Dolphins' agreement triggered provisions of Section 2.4. Mr. Charles responded that day, stating that "I am sure you will understand that we cannot provide an outside party a copy of our agreement." Mr. Charles went on to attempt to assuage Mr. McCullough's concerns, stating that "I can tell you that the deal, while for different sports, is very similar in scope to our current partnership." Over the following months, Clear Channel would continue to attempt to mislead the Miami Heat about the nature of its new deal with the Miami Dolphins, claiming overall parity between the contracts and insisting that Clear Channel "looked out for the Heat" in its negotiations with the Dolphins. These assurances would prove to be blatantly false.

13. When Clear Channel refused to allow the Heat to see the Miami Dolphins agreement, citing confidentiality concerns, the Heat proposed that the parties allow the contract to be reviewed by an independent third party attorney in order to determine whether the terms of the Dolphins agreement triggered the Section 2.4 "most favored nations" clause. Clear Channel expressed reluctance to take even this step. Instead, Mr. Charles suggested that, "instead of making the lawyers rich, we get together and go over any areas of concern . . . ." Over the following months, the Miami Heat continued to request that Clear Channel provide the Miami Heat with the terms of the Dolphins agreement so that the Heat could meaningfully understand its rights. Clear Channel continued to delay. Finally, in late July, 2010 – nearly five months after the Heat's initial request – Clear Channel voluntarily provided the Miami Heat with the terms of the Dolphins agreement. The Heat quickly understood why Clear Channel had been so reluctant to provide them with it.

14. When the Heat was finally able to review Clear Channel's agreement with the Miami Dolphins, the Heat learned that the value of the agreement provided to the Dolphins

5

surpassed the value of the Rights Agreement by a breathtaking magnitude, whether viewed as a package, or viewed by the agreement's separate material terms. The Dolphins' agreement is more valuable and beneficial to the sports team in numerous ways, including the following:

a. <u>Game Day Broadcasts</u>:

   1. Clear Channel granted the Miami Dolphins game broadcast rights – and the right to sell advertising – on both WINZ-AM and WBGG-FM, an extremely powerful FM station.

   2. Similarly, Clear Channel has agreed to broadcast the Miami Dolphins pre and post-game shows on both WBGG-FM and WINZ-AM, each in a two (2)-hour program format versus the thirty (30) minute programs the Miami Heat are given.

b. <u>Inventory Control</u>:

   Clear Channel granted the Miami Dolphins inventory control for the: (i) two (2) hours of pre-game broadcast on both WINZ-AM and WBGG-FM; (ii) the in-game broadcast on both WINZ-AM and WBGG-FM; and (iii) the two (2) hours of post-game broadcast on both WINZ-AM and WBGG-FM. The Rights Agreement only provides for in-game inventory control on WINZ-AM for the Miami Heat.

c. <u>Club Coach and Player Shows</u>:

   1. Clear Channel granted the Miami Dolphins: (i) roughly 520 hours of Club Coach and Player show time versus roughly 26 hours for the Miami Heat; (ii) a minimum of three (3) promotional announcements per day pre-promoting the show and the show's naming rights partner versus no promotional announcements for the Heat; as well as (iii) options to extend the scope and rights to network the show.

   2. Clear Channel granted the Miami Dolphins the right to create a "Dolphins Monday" and/or "Dolphins Friday" show with Clear Channel or another broadcast partner, by extending the Dolphins' daily show by one hour. The Rights Agreement provides no such benefit to the Miami Heat.

d. <u>Drive Time Show</u>:

   1. Clear Channel granted the Miami Dolphins a daily three (3) minute segment during South Florida's First News on WIOD-AM (Monday-Friday) at a regularly scheduled time beginning the first week of training camp and running through the last regular or post-season game. Clear Channel also

    granted the Miami Dolphins one (1) billboard and one (1) thirty (:30) second commercial during the same morning Drive Time Show. The Rights Agreement provides no such benefit to the Miami Heat.

2. Clear Channel also provided the Miami Dolphins with a (:60) sixty second segment on WINZ Station during P.M. drive time (Monday through Friday) that is repurposed from WIOD, as well as one (1) billboard and one (1) thirty second (:30) commercial with the segment. The Miami Heat receives only forty two (42) pre-recorded segments that are not repurposed from WIOD.

e. <u>Draft Day Show</u>:

Clear Channel has granted the Miami Dolphins fifty (50) percent of the no less than fourteen (14) minutes of commercial inventory per hour of the Dolphins *three-day* Draft Day Show broadcast, with approval rights granted on Rate Card minimums. The Rights Agreement provides no such benefit to the Miami Heat.

f. <u>Dolphins 24/7 HD Channel</u>:

Clear Channel has obligated itself to create a separate HD-2 or 3 channel to create a 24-hour format based around the Miami Dolphins, with naming rights granted to the Miami Dolphins. The Rights Agreement provides no such benefit to the Miami Heat.

g. <u>Promotion Outdoor</u>:

Clear Channel has granted the Miami Dolphins a minimum of fifteen (15) 14'x48' Billboards throughout Broward and Miami-Dade to be displayed July 1 through the last game of the season, promoting the games on WIOD-AM and WBGG-FM, with options granted to the Miami Dolphins to include a co-branded Miami Dolphins Radio Network logo with its naming rights partner, as well as snipes to direct viewers to ticket sales or the Miami Dolphins website. Clear Channel has also committed to set up discussions between the Miami Dolphins and CCOOH to discuss digital boards focused on weekend rotations leading up to game time with game updates. The Rights Agreement provides no such benefit to the Miami Heat.

h. <u>Promotion Adlets: 05's</u>:

Clear Channel had granted the Miami Dolphins a minimum of five (5) Adlets per day (Monday through Sunday, 5 a.m. through 12 a.m.) from July 1 through the playing season identifying WBGG-FM as the home of the Dolphins and, if time permits, to include the radio network naming rights partner. The Rights Agreement provides no such benefits to the Miami Heat.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130

    i. <u>Promotion – Promo's</u>:

        Clear Channel has granted the Dolphins a minimum of twenty-five (25) fifteen (:15) second promos per week on WIOD-AM and WINZ-AM and a minimum of twenty (20) fifteen second (:15) promos per week on WBGG-FM promoting each game broadcast from July 1 through the playing season versus the Miami Heat's fifteen (15) promos per game on WINZ-AM and five (5) on WIOD-AM only. The Rights Agreement provides no such benefits to the Miami Heat.

    j. <u>Promotion – Cluster Promo's</u>:

        Clear Channel has granted the Miami Dolphins a minimum of two (2) fifteen (:15) second promos per day on WIOD, WMIA, WHYI, WMGE, and WMIB cross promoting the broadcasts WBGG from July 1 through the playing season. Such promos can tag sponsor names, ticket sales, or the radio network naming rights partner. The Rights Agreement provides no such benefits to the Miami Heat.

    k. <u>Promotion – Annual Adlets: 05's</u>:

        Clear Channel has granted the Miami Dolphins a minimum of two (2) Adlets per day (Monday through Sunday from 5 a.m. to 8 p.m.) on WBGG-FM identifying the station as the home of the Miami Dolphins (with the possibility of including the radio network naming rights partner) all outside of the July 1/playing season window. The Rights Agreement provides no such benefits to the Miami Heat.

    l. <u>Public Service Announcements</u>:

        Clear Channel has provided the Miami Dolphins with a PSA bank of one (1) thirty second (:30) PSA per day, 365 days per year to be used on all Clear Channel stations (2550 PSA's annually). Clear Channel further committed to run these PSAs during the best available time slots Monday through Sunday from 6 a.m. to 12 p.m. and Clear Channel will choose a particular daypart that is most conducive for each individual station's inventory (i.e., midday or night). The Rights Agreement provides no such benefits to the Miami Heat.

    m. <u>Charitable Events</u>:

        1. Clear Channel has committed to include all Miami Dolphins related charitable events and activities on each of the seven Clear Channel website community event pages. The Rights Agreement provides no such benefits to the Miami Heat.

n.  **Commercial Inventory – Team Business:**

1. Clear Channel has granted the Miami Dolphins a spot bank of 4410 spots (above and beyond the aforementioned 2550 PSA spots) versus the Miami Heat's 900 total spots and such spots must air daily from Monday through Sunday (5 a.m. to 8 p.m.). Such spots can be used for any team-related business initiatives, including event or initiative naming rights/presenting sponsor partners. The Rights Agreement does not provide equivalent benefits to the Miami Heat.

2. Clear Channel has also provided the Miami Dolphins with 770 road blocks versus the Miami Heat's 100. Further, their ten (10) road block days will run on all seven Clear Channel stations with one (1) thirty second (:30) or fifteen second (:15) live or recorded commercial per hour between 6 a.m. to 7 p.m. to promote single game ticket sales. The Rights Agreement provides no such benefits to the Miami Heat.

o.  **Commercial Inventory – Cluster Pass Thru:**

In addition to the aforementioned 4410 spots and 2550 PSA's, Clear Channel has granted the Miami Dolphins 2555 thirty second (:30) commercials to be used as pass through spots for their sponsors on all Clear Channel stations during each year. Clear Channel has also granted the Miami Dolphins "most favored nation" status to purchase additional commercial spots to activate sponsorships (i.e., Monday through Sunday, 6 a.m. to 7 p.m., commercial inventory $90 per thirty second (:30) rate). The Rights Agreement provides no such benefits to the Miami Heat.

p.  **CCSF Online:**

1. Clear Channel has given the Miami Dolphins a 24-hour Home Page Takeover whereby Clear Channel will provide the Miami Dolphins one (1) 24-hour web takeover on each of its seven (7) station websites each quarter. These takeovers will include 728x90, 234x60, and 120x90 banner areas on each station homepage. The takeovers may be used to promote the team, ticket sales, or other team events. The Rights Agreement provides no such benefits to the Miami Heat.

2. Clear Channel has also provided the Miami Dolphins with 10% SOV of Station website impressions in banner ads on each of the seven (7) Clear Channel stations per year. Such banner ads may be used to promote the team, ticket sales, or other related team events or partners. The Rights Agreement provides no such benefits to the Miami Heat.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130

3. Similarly, Clear Channel has given the Miami Dolphins landing pages to be created by WIOD-AM, WBGG-FM, and WINZ-AM containing team-related content that will live on the Miami Dolphins webpage, as well as access to the landing page that will be on each of the stations' home pages. The Rights Agreement provides no such benefits to the Miami Heat.

4. Finally, Clear Channel has given the Miami Dolphins streaming commercials with companion 200x250 banners, four (4) times per day, Monday through Friday (6 a.m. through 7 p.m.) for a total of twenty (20). The commercial usages shall mirror the pass through cluster commercials. They also receive a fifteen second (:15) Video Gateway with a companion 300x250 banner with a minimum 25% SOV per station per month. The Rights Agreement provides no such benefits to the Miami Heat.

q. <u>Rights Fees</u>:

For all of the aforementioned rights and benefits, the Miami Dolphins are paying *no* rights fees, although the Miami Heat has paid $730 per game pursuant to the Rights Agreement.

15. The Clear Channel/Dolphins agreement also violated the Miami Heat's preemption protections contained in Section 2.2 of the Rights Agreement. The Dolphins Agreement provides that the Miami Dolphins game broadcasts will have priority and will not be preempted by any other sports team broadcast. In fact, both the Miami Dolphins and the Miami Heat are scheduled to play at 1 p.m. on October 31, 2010, and the Miami Heat has a number of games scheduled in January, 2011, that could conflict with Miami Dolphins playoff games.

16. On September 3, 2010, the Miami Heat sent notice to Clear Channel of the various breaches of Sections 2.2 and 2.4 of the Rights Agreement resulting from the overwhelmingly superior and preferential terms granted to the Dolphins. The September 3 letter required that Clear Channel provide the Miami Heat with written confirmation, within 30 days, that Clear Channel would cure its breaches, that Heat broadcasts would not be preempted, and that the Miami Heat would receive the benefit of the superior package *and* terms granted to the Miami Dolphins. (A copy of the September 3 letter is attached hereto as Exhibit "B.")

17.  In the days following Clear Channel's receipt of the Miami Heat's demand to cure, Clear Channel representatives again assured Heat personnel that its "priority" relationship with the Heat was of tantamount importance to Clear Channel, and that Clear Channel was indeed willing to grant the Heat nearly all of the more favorable terms it had already granted to the Dolphins. On September 14, the Heat requested that Clear Channel state their commitment in writing. Clear Channel's response was that, in fact, it would only be willing to grant the Heat more favorable terms if the Heat entered into a new, multi-year commitment with Clear Channel.

18.  When the Heat indicated that it was not willing to extend its relationship with a "partner" that had consistently displayed a profound lack of candor over the previous months, Clear Channel's business representatives withdrew their offer, and told the Heat that Clear Channel's counsel would respond to the Heat's September 3 letter "within the required 30 days." Clear Channel, knowing that the Heat's exhibition season – and radio broadcasts – would begin on October 5, clearly wanted to maximize its leverage with the Heat. Indeed, Clear Channel's attorneys waited until the afternoon of the last business day of Clear Channel's cure period to announce that Clear Channel was not willing to provide the Heat with *any* of the more beneficial material terms granted to the Dolphins, or to provide the Heat with a package that would be arguably equivalent to that given the Dolphins. Clear Channel would only agree that the Station would not preempt the broadcast of Heat games, as required by Section 2.2 of the Rights Agreement.

19.  On October 6, 2010, in light of Clear Channel's lack of good faith and candor, the Heat notified Clear Channel of its intent, pursuant to Section 14.2 of the Rights Agreement, to terminate the Rights Agreement, effective thirty days from the notice. In this action, the Heat

11

seeks damages flowing from Clear Channel's breach of contract and breach of covenant of good faith and fair dealing.

## COUNT I – BREACH OF CONTRACT

20. The Miami Heat realleges and incorporates by reference the allegations of paragraphs 1 through 19 as if set forth fully herein.

21. The Rights Agreement, entered into by and between Clear Channel and the Miami Heat on July 1, 2008, is a valid and enforceable contract.

22. The Miami Heat has complied with the terms of the Rights Agreement.

23. Clear Channel has materially breached Section 2.4 of the Rights Agreement by entering into an agreement with the Miami Dolphins that, *inter alia*, provides the Miami Dolphins with priority and preemption protections, is of substantially greater total value, and has more favorable individual terms than the Rights Agreement.

24. As a direct and proximate cause of Clear Channel's material breaches, the Miami Heat has suffered damages.

25. Pursuant to Section 15.8 of the Rights Agreement, the Miami Heat is entitled to recover reasonable attorneys fees, expenses, and costs incurred as a result of this litigation.

WHEREFORE, Plaintiff, the Miami Heat, demands judgment against Clear Channel for compensatory damages, including interest, costs, and expenses, in an amount to be proven at trial, and an award of its attorneys fees, expenses, and costs associated with this claim.

## COUNT II – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

26. The Miami Heat realleges and incorporates by reference the allegations of paragraphs 1 through 19, and 20 through 25, as if set forth fully herein.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower • 150 West Flagler Street • Miami, FL 33130

27. The Rights Agreement entered into by and between Clear Channel and the Miami Heat on July 1, 2008 is a valid and enforceable contract.

28. Clear Channel, through the following conscious and deliberate acts and omissions, has unfairly frustrated the purpose of the Rights Agreement and disappointed the Miami Heat's reasonable expectations by:

   a. Materially breaching Section 2.4 of the Rights Agreement;

   b. Continuously attempting to mislead the Miami Heat about the nature of its new deal with the Miami Dolphins;

   c. Misrepresenting overall parity between the Rights Agreement and the Miami Dolphins agreement;

   d. Falsely insisting to the Miami Heat that Clear Channel "looked out of the Heat" in its negotiations with the Dolphins;

   e. Refusing to allow the Miami Heat or an independent third party to review the terms of the Miami Dolphins' agreement until late July, 2010;

   f. Continuously making material misrepresentations to Miami Heat regarding its intention to cure; and

   g. Attempting to leverage the Miami Heat by refusing to cure its material breaches of the Rights Agreement unless and until the Miami Heat agreed to enter into a new multi-year commitment with Clear Channel.

29. By and through these acts and omissions, Clear Channel has acted capriciously to contravene the reasonable expectations of the Miami Heat, has evaded the spirit of the Rights Agreement, has willfully and materially breached the Rights Agreement, and has deprived the

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130

Miami Heat of the benefits of the Rights Agreement, in violation of its obligation of good faith in performance.

30.     As a direct and proximate result of Clear Channel's acts and omissions, the Miami Heat has sustained damages.

31.     Pursuant to Section 15.8 of the Rights Agreement, the Miami Heat is entitled to recover reasonable attorneys fees, expenses, and costs incurred as a result of this litigation.

WHEREFORE, Plaintiff, the Miami Heat, demands judgment against Clear Channel for compensatory damages, including interest, costs, and expenses, in an amount to be proven at trial, and an award of its attorneys fees, expenses, and costs associated with this claim.

### DEMAND FOR JURY TRIAL

The Miami Heat hereby demands trial by jury on all issues so triable.

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Attorneys for Plaintiff
Suite 2200, Museum Tower
150 West Flagler Street
Miami, Florida 33130
Telephone: 305-789-3200
Facsimile: 305-789-3395

By: _____
ALAN H. FEIN
Florida Bar No. 288349
afein@stearnsweaver.com
GERI E. FISCHMAN
Florida Bar No. 0055823
gfischman@stearnsweaver.com

Dated: October 7, 2010